******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ANGELA BORELLI, ADMINISTRATRIX (ESTATE
OF BRANDON GIORDANO) *v.* ANTHONY
RENALDI ET AL.
(SC 20232)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The plaintiff, the administratrix of the estate of the decedent, B, sought to
recover damages for the death of B as a result of the alleged negligence
of the defendants, the town of Seymour and three officers of the Seymour
Police Department. B was a backseat passenger in a vehicle operated
by E. E had activated underglow lights that were affixed to the undercar-
riage of the vehicle, the use of which are illegal, and an officer of the
Seymour Police Department, observing the lights, pursued E's vehicle
in an attempt to pull E over. In response to the pursuit, E operated
his vehicle at a high rate of speed, and, after the officer activated his
emergency lights and siren, he notified dispatch that he was in pursuit
of E's vehicle. Within two minutes of the start of the pursuit, E's vehicle
struck an embankment and flipped onto its roof, causing injuries to B
that ultimately resulted in his death. The plaintiff alleged, inter alia,
that the officer negligently pursued E's vehicle, the shift supervisor
negligently failed to follow department protocol and failed to order the
termination of the pursuit, and the defendant town was liable pursuant
to statute (§ 52-557n (a) (1) (A)) for the negligent acts of its employees
and was required to indemnify the defendant officers. The trial court
granted the defendants' motion for summary judgment, concluding that
they were entitled to governmental immunity and that the plaintiff's
claim regarding indemnification also failed as a matter of law. In conclud-
ing that the defendants were immune from liability, the court reasoned
that, although the statute (§ 14-283 (d)) governing the operation of emer-
gency vehicles and the town pursuit policy required police officers, in
determining whether to initiate a pursuit, to drive with due regard for the
safety of the general public, that mandate necessarily required officers
to exercise their judgment and that their duty under those provisions,
therefore, was discretionary. The trial court rendered judgment for the
defendants, from which the plaintiff appealed. *Held*:

1. This court having concluded that § 14-283 (d), the uniform statewide
   pursuit policy set forth in the applicable state regulations (§§ 14-283a-
   1 through 14-283a-4), and the town pursuit policy require officers to
   exercise judgment in determining whether to pursue a fleeing motorist,
   the trial court correctly concluded that the defendant officers had a
   discretionary, rather than a ministerial, duty under § 14-283 (d) to drive
   with due regard for the safety of all persons and property and, therefore,
   were entitled to immunity from liability for their decision to pursue E's
   vehicle: the phrase "due regard" in § 14-283 (d) imposes a general duty
   on officers to exercise their judgment and discretion in a reasonable
   manner, and, therefore, the duty to act with due regard is a discretionary
   one, and the imposition of a discretionary duty under § 14-283 (d) was
   further supported by prior cases of this court that have interpreted
   similar statutory language to create a discretionary, rather than a ministe-
   rial, duty to act; moreover, the uniform statewide pursuit policy set
   forth in §§ 14-283a-1 through 14-283a-4 of the state regulations reinforces
   the discretionary nature of the duty of officers in the context of police
   pursuits, as that policy requires officers to evaluate the particular circum-
   stances presented and to weigh the risks presented by pursuing a vehicle
   against the risks presented by not pursuing; furthermore, the language
   of the town pursuit policy also reinforces the discretionary nature of
   the duty imposed on the defendant officers, as that language makes
   clear that they are required to exercise their judgment and discretion
   in evaluating the particular circumstances in determining whether to
   engage in and to continue a pursuit.

2. The trial court correctly determined that the plaintiff had failed to prove
   that the identifiable person-imminent harm exception to discretionary

act immunity applied, as the plaintiff failed to demonstrate that B was an identifiable person or a member of a class of foreseeable victims: the record revealed that B was not legally compelled to get into E's vehicle and was a voluntary passenger, and, thus, the plaintiff failed to demonstrate that B was a member of a class of foreseeable victims; moreover, notwithstanding the plaintiff's suggestion that, because § 14-283 (d) requires officers to drive with due regard for the safety of the general public, B belonged to a class of foreseeable victims, that suggestion was inconsistent with both this court's prior interpretations of the scope of the identifiable person-imminent harm exception and the public policy principles underlying the grant of governmental immunity to the discretionary acts of municipal officers; furthermore, the plaintiff's argument that B was an identifiable person implicated the same public policy principle as her argument that he was a member of a class of foreseeable victims, as, in the context of a police pursuit, there always will be at least one person whose presence the police could or should be aware of, namely, the driver of the pursued vehicle, and, if this court agreed with the plaintiff, the exception would swallow the rule.

(*Two justices concurring separately in two opinions*;
*one justice dissenting in one opinion*)

Argued April 29, 2019—officially released June 24, 2020**

*Procedural History*

Action to recover damages for, inter alia, the death of the plaintiff's decedent as a result of the alleged negligence of the named defendant et al., and for other relief, brought to the Superior Court in the judicial district of Ansonia-Milford, where the defendants filed apportionment complaints against Angela Borelli and Eric Ramirez; thereafter, the court, *Tyma, J.*, granted the defendants' motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed. *Affirmed.*

*Steven J. Errante*, with whom were *Matthew D. Popilowski* and, on the brief, *Daniel P. Scholfield* and *Marisa A. Bellair*, for the appellant (plaintiff).

*Thomas R. Gerarde*, with whom was *Kristan M. Maccini*, for the appellees (defendants).

*Opinion*

KAHN, J. This appeal requires us to consider the narrow question of whether a town and its municipal police officers are shielded by governmental and qualified immunity from liability for the decision to initiate a high-speed police pursuit that lasted less than two minutes and ended in a fatal automobile accident. The plaintiff, Angela Borelli, administratrix of the estate of Brandon Giordano (decedent), appeals[1] from the judgment of the trial court granting summary judgment in favor of the defendants, the town of Seymour (town) and three officers of the Seymour Police Department (department), Officer Anthony Renaldi, Officer Michael Jasmin and Sergeant William King. The plaintiff claims that the trial court incorrectly concluded that (1) General Statutes § 14-283 (d)[2] imposes a discretionary rather than a ministerial duty on police officers "to drive with due regard for the safety of all persons and property" in determining whether to pursue a motorist who flees when an officer attempts to pull him or her over, and (2) the plaintiff failed to demonstrate that any issue of material fact remained regarding whether the decedent was an identifiable victim subject to imminent harm on the basis of the court's finding that there was no evidence in the record supporting that conclusion. We affirm the judgment of the trial court.

It is important at the outset to emphasize what this case is *not* about. The issue presented in this appeal is independently narrowed by the statutory language and the claims raised by the plaintiff on appeal. First, although the plaintiff's complaint reasonably may be read to have raised the issue of whether governmental immunity shields officers with respect to the *manner* of driving while pursuing a fleeing motorist, her argument on appeal focuses exclusively on whether governmental immunity applies to an officer's decision to engage in such a pursuit. Second, § 14-283 pertains solely to the operation of emergency vehicles while responding to emergency calls. See General Statutes § 14-283 (a) ("As used in this section, 'emergency vehicle' means any ambulance or vehicle operated by a member of an emergency medical service organization responding to an emergency call, any vehicle used by a fire department or by any officer of a fire department while on the way to a fire or while responding to an emergency call but not while returning from a fire or emergency call, any state or local police vehicle operated by a police officer or inspector of the Department of Motor Vehicles answering an emergency call or in the pursuit of fleeing law violators or any Department of Correction vehicle operated by a Department of Correction officer while in the course of such officer's employment and while responding to an emergency call.") Nothing in the language of § 14-283 suggests that it pertains to the operation of emergency vehicles under

routine conditions. This decision, accordingly, does not address the question of whether governmental immunity applies to routine driving of emergency response vehicles by municipal actors.

The trial court found the following facts to be undisputed. "On the evening of March 9, 2012, [the decedent] was a backseat passenger in a Ford Mustang convertible operated by his friend, [Eric] Ramirez. Another friend, Dion Major, was a passenger in the front seat. They were headed to Major's house in Seymour at the time of the accident.

"Ramirez exited Route 8 northbound at exit 22 in Seymour, and proceeded to turn left onto Route 67 toward Oxford. At the time he was operating his vehicle on Route 67, Ramirez had activated a set of lights that were affixed to the undercarriage. The lights are commonly referred to as underglow lights, the use of which . . . are illegal in this state.

"As Ramirez proceeded on Route 67 in Seymour, his vehicle came to the attention of Renaldi, who was patrolling the west side of Seymour.[3] Renaldi observed Ramirez' vehicle had illuminated underglow lights, and he decided to pull him over. Renaldi was quickly able to position his vehicle behind Ramirez' vehicle. Ramirez accelerated his vehicle in response, and Renaldi sped up his vehicle in an attempt to lessen the distance between the two vehicles. Ramirez continued operating his vehicle at a high rate of speed and illegally passed a few vehicles being operated in the same direction of travel on Route 67. At the time Ramirez illegally passed the vehicles, if not before that time, Renaldi activated his emergency lights and siren with the intent to stop Ramirez' reckless driving. After he activated his lights and sirens, Renaldi notified dispatch that he was engaged in pursuit of Ramirez' Mustang. Renaldi pursued Ramirez' vehicle into Oxford. After a few miles, Ramirez turned off Route 67 onto Old State Road in Oxford. Renaldi lost sight of the vehicle when it turned onto Old State Road. While operating his vehicle on Old State Road, Ramirez' vehicle struck an embankment off the side of Old State Road and turned over onto its roof. [The decedent], who was fifteen years old at the time, was killed in the accident. Ramirez and Major survived. Renaldi located the overturned vehicle near a commercial building, approximately two-tenths of one mile from the intersection of Route 67 and Old State Road. The entire pursuit lasted less than two minutes." (Footnote added.)

The plaintiff subsequently brought this action against the town, Renaldi, Jasmin,[4] and King. The complaint alleged that Renaldi and Jasmin were negligent in pursuing Ramirez' vehicle, that King, who was the shift supervisor, negligently failed to follow department protocol requiring him to evaluate the initiation and continuation of the pursuit and negligently failed to order the termi-

nation of the pursuit, and that the town was liable pursuant to General Statutes § 52-557n (a) (1) (A) for the negligent acts of its agents and/or employees and also was liable to indemnify the officers pursuant to General Statutes § 7-465. The defendants moved for summary judgment as to all counts of the complaint, arguing, inter alia, that the plaintiff's claims were barred by the doctrine of governmental immunity and that no exception applied.

The trial court granted the defendants' motion, first concluding that the officers' alleged actions "inherently involve[d] the exercise of judgment and discretion." The court reasoned that, although both § 14-283 and the Seymour Police Department Pursuit Policy (town pursuit policy) require police officers, in determining whether to initiate a pursuit, to drive with due regard for the safety of the general public, that mandate necessarily requires officers to exercise their judgment. The court particularly pointed to the language of the town pursuit policy, which directs officers to consider case specific circumstances in determining whether to pursue, such as the nature of the offense, traffic, weather, road conditions and time of day. See Seymour Police Department Pursuit Policy § 5.11.11 (A) through (H). The officers' actions, therefore, were entitled to governmental immunity.

The trial court next turned to the plaintiff's contention that an exception to discretionary act immunity applied because the decedent was a member of a foreseeable class of victims and/or an identifiable individual subject to imminent harm. The court found that there were no allegations or evidence presented that the decedent was a member of a foreseeable class of victims because nothing in the record suggested that the decedent was statutorily compelled or mandated to get into Ramirez' vehicle. The court also found that there was no evidence in the record that Renaldi or Jasmin had notice of the decedent's presence in the vehicle. Therefore, the court concluded, the plaintiff had not met her burden of proving that the decedent was an identifiable person subject to imminent harm. Because the court concluded that the officers and the town were entitled to governmental immunity, it also concluded that the plaintiff's claim for indemnification pursuant to § 7-465 failed as a matter of law. This appeal followed.

We begin with the applicable standard of review. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the

absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . On appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court." (Internal quotation marks omitted.) *Reclaimant Corp.* v. *Deutsch*, 332 Conn. 590, 598–99, 211 A.3d 976 (2019).

I

The plaintiff first claims that the trial court incorrectly concluded that § 14-283 (d), as well as the applicable regulations and the town pursuit policy, impose a discretionary rather than a ministerial duty on police officers "to drive with due regard for the safety of all persons and property" when determining whether to pursue a fleeing motorist.[5] The plaintiff claims that § 14-283 (d), the Uniform Statewide Pursuit Policy, set forth in §§ 14-283a-1 through 14-283a-4 of the Regulations of Connecticut State Agencies, and the town pursuit policy together impose a ministerial duty on police officers to exercise due regard for the safety of all persons and property when initiating a pursuit of a fleeing motorist. Specifically, the plaintiff contends that the applicable provisions impose a ministerial duty on officers, before engaging in a pursuit, to first weigh the seriousness of the precipitating offense and the dangerousness of the pursuit. Because we conclude that the applicable provisions require officers to exercise judgment in determining whether to pursue a fleeing motorist, we conclude that the trial court correctly determined that the duty imposed is discretionary.

The following principles of governmental immunity are pertinent to our resolution of the plaintiff's claims. "The [common-law] doctrines that determine the tort liability of municipal employees are well established. . . . Generally, a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts. . . . Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature. . . . The hallmark of a discretionary act is that it requires the exercise of judgment. . . . In contrast, [a ministerial act] refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion. . . .

"Municipal officials are immunized from liability for negligence arising out of their discretionary acts in part because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the limits desirable in our society. . . . Discretionary act immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in

their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury. . . . In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion. . . . This is because society has no analogous interest in permitting municipal officers to exercise judgment in the performance of ministerial acts. . . .

"The tort liability of a municipality has been codified in § 52-557n. Section 52-557n (a) (1) provides that [e]xcept as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . . . Section 52-557n (a) (2) (B) extends, however, the same discretionary act immunity that applies to municipal officials to the municipalities themselves by providing that they will not be liable for damages caused by negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Violano* v. *Fernandez*, 280 Conn. 310, 318–20, 907 A.2d 1188 (2006).

"For purposes of determining whether a duty is discretionary or ministerial, this court has recognized that '[t]here is a difference between laws that impose general duties on officials and those that mandate a particular response to specific conditions.' *Bonington* v. *Westport*, 297 Conn. 297, 308, 999 A.2d 700 (2010). 'A ministerial act is one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment [or discretion] upon the propriety of the act being done.' . . . *Blake* v. *Mason*, 82 Conn. 324, 327, 73 A. 782 (1909) . . . . In contrast, when an official has a general duty to perform a certain act, but there is no 'city charter provision, ordinance, regulation, rule, policy, or any other directive [requiring the government official to act in a] prescribed manner,' the duty is deemed discretionary." (Citations omitted; footnote omitted.) *Northrup* v. *Witkowski*, 332 Conn. 158, 169–70, 210 A.3d 29 (2019).

"In accordance with these principles, our courts consistently have held that to demonstrate the existence of a ministerial duty on the part of a municipality and its agents, a plaintiff ordinarily must point to some statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, by its clear language, compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion.

. . . Because the construction of any such provision, including a municipal rule or regulation, presents a question of law for the court . . . whether the provision creates a ministerial duty gives rise to a legal issue subject to plenary review on appeal." (Citations omitted; internal quotation marks omitted.) *Ventura* v. *East Haven*, 330 Conn. 613, 631–32, 199 A.3d 1 (2019).

Because this appeal concerns the actions of police officers and the town police department, we also observe that "[i]t is firmly established that the operation of a police department is a governmental function, and that acts or omissions in connection therewith ordinarily do not give rise to liability on the part of the municipality." (Internal quotation marks omitted.) *Gordon* v. *Bridgeport Housing Authority*, 208 Conn. 161, 180, 544 A.2d 1185 (1988). "Indeed, this court has long recognized that it is not in the public's interest to [allow] a jury of laymen with the benefit of 20/20 hindsight to second-guess the exercise of a [police officer's] discretionary professional duty. Such discretion is no discretion at all. . . . Thus, as a general rule, [p]olice officers are protected by discretionary act immunity when they perform the typical functions of a police officer." (Citations omitted; internal quotation marks omitted.) *Ventura* v. *East Haven*, supra, 330 Conn. 630–31.

We next turn to the relevant statutory provisions and rules. Section 14-283 permits the operators of emergency vehicles to disregard certain traffic rules in light of the circumstances. The term "emergency vehicle," as used in § 14-283 (a), includes "any state or local police vehicle operated by a police officer . . . in the pursuit of fleeing law violators . . . ." Section 14-283 (b) (1) provides in relevant part that an operator of an emergency vehicle may "(B) . . . proceed past any red light or stop signal or stop sign, but only after slowing down or stopping to the extent necessary for the safe operation of such vehicle, (C) exceed the posted speed limits or other speed limits imposed by or pursuant to section 14-218a or 14-219 as long as such operator does not endanger life or property by so doing, and (D) disregard statutes, ordinances or regulations governing direction of movement or turning in specific directions." The ability to disregard traffic rules is not, however, unlimited. By its terms, § 14-283 applies to state and local police vehicles only when "operated by a police officer or inspector of the Department of Motor Vehicles answering an emergency call or in the pursuit of fleeing law violators . . . ." General Statutes § 14-283 (a). Additionally, subsection (d) of § 14-283 provides: "The provisions of this section *shall not* relieve the operator of an emergency vehicle from the duty to drive *with due regard for the safety of all persons and property*." (Emphasis added.) It is this requirement, that officers drive with due regard for safety, on which the plaintiff relies in contending that the officers' duty to weigh the safety of all persons and property and the

seriousness of the offense prior to initiating a pursuit was ministerial, rather than discretionary.

The phrase "due regard," however, rather than mandating a particular response to specific conditions, imposes a general duty on officers to exercise their judgment and discretion in a reasonable manner. See *Bonington* v. *Westport*, supra, 297 Conn. 308 (highlighting significance of "difference between laws that impose general duties on officials and those that mandate a particular response to specific conditions"). Because § 14-283 (d) does not define the phrase "due regard," we are guided by General Statutes § 1-1 (a), which provides: "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." Both the legal and common usage definitions yield the same conclusion—"due regard" directs officers to exercise their judgment prudently. Black's Law Dictionary defines the term "due" as "[j]ust, proper, regular, and reasonable," and "regard" as "[a]ttention, care, or consideration . . . ." Black's Law Dictionary (11th Ed. 2019) pp. 631, 1535. Those definitions evoke the early days of law school, when all aspiring lawyers first learn of the classic concepts of "reasonable consideration" and "due care." "Due regard" is a synonym for those phrases, which embody the duty to exercise good judgment. The technical meaning of the phrase is echoed in the common usage definition. Merriam-Webster's Dictionary defines "with due regard to" as "with the proper care or concern for." Merriam-Webster's Dictionary, available at https://www.merriam-webster.com/dictionary/with due regard to (last visited June 16, 2020). By its very definition, therefore, the duty to act with due regard is a *discretionary duty*.[6]

We also look to a related statute, General Statutes (Supp. 2020) § 14-283a,[7] which authorizes the adoption of "a uniform, state-wide policy for handling pursuits by police officers." General Statutes (Supp. 2020) § 14-283a (b) (1). As we explain in detail herein, the Uniform Statewide Pursuit Policy adopted pursuant to § 14-283a contemplates that officers will exercise their judgment and discretion in giving due regard to the safety of all persons and property when determining whether to engage a pursuit.

Our conclusion that § 14-283 (d) imposes a discretionary duty on police officers to act finds further support in the decisions of this court, which have interpreted similar statutory language to create a discretionary, rather than a ministerial, duty to act. For example, in *Coley* v. *Hartford*, 312 Conn. 150, 95 A.3d 480 (2014), we considered the type of duty created by General Statutes (Rev. to 2013) § 46b-38b (d) (5) (B), which

directs officers who report to the scene of a report of domestic violence, upon determining that no cause exists for arrest, to remain "at the scene for a reasonable time until, in the reasonable judgment of the officer, the likelihood of further imminent violence has been eliminated."[8] The plaintiff in *Coley* argued that, because the statute *required* that officers remain at the scene for a reasonable time and exercise reasonable judgment, they did not have discretion to do otherwise, and the question of the reasonableness of the officers' actions should go to the jury. *Coley* v. *Hartford*, supra, 163. We rejected that argument on the basis that the phrases "reasonable judgment" and "reasonable time" inherently require the exercise of judgment and discretion. (Internal quotation marks omitted.) Id., 165–66. That language, we explained, "makes the manner of performance expressly contingent upon the police officer's discretion . . . ." Id., 166. Similarly, in the present case, the requirement in § 14-283 (d) that, during a pursuit of a fleeing motorist, police officers must drive with "due regard for the safety of all persons and property," directs officers to exercise their duties with discretion and judgment.

Our conclusion also finds support in the Uniform Statewide Pursuit Policy, set forth in §§ 14-283a-1 through 14-283a-4 of the Regulations of Connecticut State Agencies.[9] Those regulations dictate generally that "[t]he decision to initiate a pursuit shall be based on the pursuing police officer's conclusion that the immediate danger to the police officer and the public created by the pursuit is less than the immediate or potential danger to the public should the occupants of such vehicle remain at large."[10] Regs., Conn. State Agencies § 14-283a-4 (a) (1). Section 14-283a-4 also incorporates the requirement that officers drive with "due regard for the safety of persons and property." Id., § 14-283a-4 (b) (4). In addition to setting forth the general standard, § 14-283a-4 establishes detailed guidelines for officers to follow in exercising their discretion. For instance, subsection (a) (2) provides that, in determining whether to initiate a pursuit, officers must consider road, weather and environmental conditions; population density and vehicular and pedestrian traffic; whether the identity of the occupants is known; whether immediate apprehension is necessary to protect the public or police officers and apprehension at a later time is feasible; the relative performance capabilities of the pursuit vehicle and the vehicle being pursued; the seriousness of the offense; and the presence of other persons in the police vehicle. Id., § 14-283a-4 (a) (2). All of these considerations highlight the discretionary nature of the duty. In each instance, an officer is required to evaluate the particular circumstances presented, and then weigh the risks presented by pursuing the vehicle against the risks presented by not pursuing.

We acknowledge that the Uniform Statewide Pursuit

Policy provides detailed rules governing the conduct of the pursuit. Regs., Conn. State Agencies §§ 14-283a-1 through 14-283a-4; see footnote 9 of this opinion. Those rules, however, do not constrain the officer's discretionary determination of the decision at issue in this appeal—the determination of *whether* to pursue. Many of the rules govern the actual conduct of the pursuit itself. For example, § 14-283a-4 (b) (2) of the Regulations of Connecticut State Agencies requires that a pursuing officer "activate appropriate warning equipment." Additionally, the pursuing officer must notify dispatch immediately of the pursuit, including the location, direction and speed of the pursuit, the description of the pursued vehicle and the initial purpose of the stop. Regs., Conn. State Agenciess § 14-283a-4 (b) (3). Even these detailed rules governing the conduct of the pursuit contemplate that officers will exercise discretion in implementing them. For example, the rule that ordinarily a pursuit cannot consist of more than three police vehicles is preceded by the qualifying phrase, "[u]nless circumstances dictate otherwise . . . ." Id., § 14-283a-4 (b) (5).

The Uniform Statewide Pursuit Policy's rules governing supervisory responsibilities are also quite detailed but similarly contemplate that supervisors will exercise judgment and discretion in carrying out their duties. For example, § 14-283a-4 (c) (1) of the regulations requires supervisors to "*evaluate* the situation and conditions that caused the pursuit to be initiated, the need to continue the pursuit, and shall monitor incoming information, coordinate and direct activities *as needed* to ensure that proper procedures are used." (Emphasis added.) This language inherently "makes the manner of performance expressly contingent upon the [supervisor's] discretion . . . ." *Coley* v. *Hartford*, supra, 312 Conn. 166.[11]

The town pursuit policy further reinforces the discretionary nature of the duty imposed on officers engaged in pursuit. That policy begins by recognizing the risks presented by police pursuits as well as the public interest in allowing officers the freedom to pursue persons who have or are violating the law. See Seymour Police Department Pursuit Policy § 5.11.11. The remainder of the town pursuit policy provides guidelines to assist officers in exercising their judgment in this area that is fraught with risk on either side. Considering the gravity of the concerns at issue, the policy states: "Police officers shall make every reasonable effort to apprehend a fleeing violator, but pursuit should not be carried to such an extent as to appreciably endanger the lives of innocent users of our streets and highways, or the officer himself.

"As a general rule, pursuit is not recommended or favored when the potential danger to the officer and the general public outweighs the potential advantage

of apprehending a fleeing vehicle by such means. Stated simply, pursuit is clearly inappropriate when the pursuit itself endangers life more than the escape of the person pursued. Delay may also be the wiser choice when the person is known and he or she poses no immediate threat to the community." Id.

In light of the risks presented by a pursuit, the town pursuit policy directs officers to weigh "many factors" in determining whether to initiate a pursuit. Id. In particular, some of the questions that officers "must ask themselves when deciding whether or not to pursue" include the nature of the offense, the time of day, weather and road conditions, geographical location (proximity to a school or hospital), population density, the officer's familiarity with the area, and the police cruiser's capability and reliability. Id., § 5.11.11 (A) through (H). It is significant that the policy characterizes these considerations as questions that officers must "ask themselves" and also indicates that, under some circumstances, delay may be the "wiser choice." That language makes very clear that the officers are required to exercise their judgment and discretion in evaluating the particular circumstances when determining whether to engage in a pursuit.

The town pursuit policy also directs officers to exercise their discretion in determining whether to continue a pursuit, providing that, once a pursuit has been initiated, "a continuing reconsideration of the above factors should be made by the officer. Once made, the decision to pursue is not irrevocable, and it is the intelligent officer who knows when to discontinue the chase. The experience and common sense of each officer and his knowledge of the area should also guide him in his decision." Id., § 5.11.11. The policy further explains that a continuing pursuit is "authorized when the pursuing officer has reasonable grounds to believe that an individual clearly exhibits an intent to avoid arrest by using his motor vehicle to flee. It is important that an officer weigh the seriousness of the offense which has been committed against the hazards present to the health and welfare of citizens that might be affected by the chase. If the pursuit is initiated, a continuous balancing of the seriousness versus public safety is mandatory." Id., § 5.11.12 (B).

This language clearly directs a municipal actor to exercise judgment and discretion. The town pursuit policy instructs officers to use common sense and rely on their experience, to be guided by reasonable grounds to determine if the individual intends to avoid arrest, to "weigh" the seriousness of the offense against the risks presented by the chase, to continually "balance" those concerns, and to act as an "intelligent officer . . . ." Id., §§ 5.11.11 and 5.11.12 (B). Just as with the statutory and policy language at issue in *Coley* v. *Hartford*, supra, 312 Conn. 166, all of these policy provisions

make the manner of performance contingent upon the police officer's discretion. We therefore conclude that § 14-283, read together with the Uniform Statewide Pursuit Policy, set forth in §§ 14-283a-1 through 14-283a-4 of the Regulations of Connecticut State Agencies, and the town's pursuit policy, imposes a discretionary rather than a ministerial duty upon police officers "to drive with due regard for the safety of all persons and property" when deciding whether to initiate the pursuit of a fleeing motorist.

We find unpersuasive the plaintiff's claim that § 14-283, the Uniform Statewide Pursuit Policy, set forth in §§ 14-283a-1 through 14-283a-4 of the Regulations of Connecticut State Agencies, and the town pursuit policy create a ministerial duty to *act*, while affording officers discretion as to *how* to act. Specifically, the plaintiff suggests that, because the statutory language mandates that police officers drive with due regard for safety, there is no discretion to drive without such regard. The plaintiff's claim essentially is that the duty imposed on police officers to drive with due regard for safety is not an optional one. Therefore, the plaintiff contends, the duty is a ministerial one. The plaintiff's argument misconstrues the nature of the distinction we have drawn between discretionary and ministerial duties. We have explained that "mandatory language does not necessarily render a duty ministerial as opposed to discretionary . . . ." *Coley* v. *Hartford*, supra, 312 Conn. 169. The core distinction between the two types of duty lies not in whether the duty is mandatory, but in whether the performance of that duty will inherently require the municipal actor to exercise judgment. As we explained, § 14-283 imposes a duty on officers to exercise their judgment in determining whether to initiate, how to conduct, and whether to continue the pursuit of a fleeing motorist. The mere fact that officers are *required* to exercise *good* judgment in making those decisions does not change the discretionary nature of their duties.

We are similarly unpersuaded by the plaintiff's reliance on dictum from this court's decision in *Tetro* v. *Stratford*, 189 Conn. 601, 458 A.2d 5 (1983), which, like the present case, arose from a police pursuit, for the proposition that § 14-283 imposes a ministerial duty on officers to drive with due regard for safety when deciding whether to initiate a pursuit. For two reasons, *Tetro* is inapplicable to the present case.

First, *Tetro* presented a different question than the one at issue in this appeal. The municipal defendants in *Tetro* did not assert governmental immunity and did not even directly challenge on appeal the jury's finding that they were negligent. Id., 604. *Tetro* concerned issues of proximate cause, sufficiency of the evidence as to proximate cause, and the applicability of § 14-283 to accidents that do not directly involve an emergency vehicle. Id. The defendants argued before this court

that there was insufficient evidence to establish a causal link between their acts or omissions and the plaintiff's injuries because the pursuing police cruiser was not involved in the accident that caused those injuries. Id. Instead, the plaintiff was injured when the car of the fleeing motorist collided with the plaintiff's vehicle. Id., 603. The defendants argued that, because the statutory mandate was that officers *drive the emergency vehicle* with "due regard for the safety of all persons and property," liability pursuant to § 14-283 was limited to injuries resulting from accidents that involved the emergency vehicle itself. Id., 609. This court rejected that argument, explaining, "[w]e see no reason to read the words 'safety of all persons and property' so restrictively. . . . We . . . conclude that § 14-283 provides no special zone of limited liability once the defendants' negligence has been established." (Citations omitted; footnote omitted.) Id., 609–10. We merely rejected the defendants' suggested, narrow interpretation of the words "due regard for the safety of all persons and property" in § 14-283. Id.

We also rejected the defendants' claim that "public policy requires a limitation of the liability of pursuing police vehicles to accidents involving the police car itself." Id., 610. That claim, we reasoned, assumed that the jury's verdict in favor of the plaintiff was solely predicated on the theory that the defendants had negligently failed to abandon or terminate the pursuit. Id. Because the jury returned a general verdict, however, we had to presume that it also had found for the plaintiff on his claim that the defendants were negligent in the *manner of pursuit*, as to which the defendants had not challenged the sufficiency of the evidence on appeal. Id. Therefore, we concluded that the verdict must stand, regardless of whether the defendants would prevail on their public policy argument. Id., 610–11.

In closing, we observed in dictum that, "[a]s a general proposition, our common law and our statutes do not confer upon police officers, whose conduct is negligent, *blanket* immunity from liability to an innocent bystander by virtue of their engagement in the pursuit of persons whom they believe to have engaged in criminal behavior." (Emphasis added.) Id., 611. Our rejection of the defendants' claim that they were not liable for an accident that did not directly involve the emergency vehicle has no bearing on the question of whether the duty imposed on officers by § 14-283 is discretionary or ministerial. That question was simply not before us in *Tetro*.

Second, *Tetro* was decided in 1983—thirty-seven years ago, and prior to the codification of the common law in § 52-557n. We have since interpreted and applied § 52-557n in dozens of cases.[12] See, e.g., *Northrup* v. *Witkowski*, supra, 332 Conn. 166–77; *Considine* v. *Waterbury*, 279 Conn. 830, 836–44, 905 A.2d 70 (2006);

*Spears* v. *Garcia*, 263 Conn. 22, 29–34, 818 A.2d 37 (2003). In the more recent decisions interpreting § 52-557n, we have recognized that our interpretation of the distinction between ministerial and discretionary duties is one that has evolved over time. See, e.g., *Northrup* v. *Witkowski*, supra, 166 (overruling *Spitzer* v. *Waterbury*, 113 Conn. 84, 154 A. 157 (1931), in light of "more modern case law and statutes governing the distinction between ministerial and discretionary duties"). In summary, we do not find *Tetro* to be either relevant or helpful. It addressed a different question than that presented in this case, was decided almost forty years ago, prior to the evolution of our law, and the language that the plaintiff points to is dictum.

## II

We next turn to the plaintiff's claim that the trial court incorrectly concluded that, because the plaintiff had failed to demonstrate that the decedent was either a member of a foreseeable class of identifiable victims or an identifiable individual, the identifiable person-imminent harm exception to governmental immunity did not apply in the present case. Implicitly arguing that the decedent was a member of a foreseeable class of identifiable victims, the plaintiff claims that the language of § 14-283 (d), which requires officers to "drive with due regard for the safety of *all persons* and property"; (emphasis added); made the decedent an identifiable person. That is, under the plain language of the statute, the plaintiff contends, all persons involved in the pursuit are identifiable. To the extent that the plaintiff's argument, relying on the language of § 14-283 (d), may be construed to claim that the decedent was a member of a foreseeable class of identifiable victims,[13] the defendants respond that, because the decedent was not legally compelled to be in the vehicle, he did not belong to any such class.

As to the decedent's status as an identifiable individual, the plaintiff challenges the trial court's finding that no evidence had been presented to demonstrate that Renaldi was aware that passengers were in the vehicle. Even if the trial court's finding was correct, the plaintiff contends, pursuant to this court's decision in *Sestito* v. *Groton*, 178 Conn. 520, 423 A.2d 165 (1979), evidence that Renaldi had specific knowledge of the presence of passengers in the vehicle was not necessary in order for the court to conclude that the decedent was an identifiable individual. The defendants respond that this court's decision in *Sestito* has been limited to its facts. They also dispute the plaintiff's challenge to the trial court's factual finding that there was no evidence in the record to support the conclusion that the decedent was an identifiable individual. We conclude that the trial court correctly determined that the plaintiff failed to demonstrate that the decedent was either a member of a class of foreseeable victims or an identifiable indi-

vidual.

This court has recognized three exceptions to governmental immunity, each of which, when proven, demonstrates that, "despite the discretionary nature of the officer's acts or omissions, the officer's duty to act was clear and unequivocal so as to warrant imposing liability on the municipality." *Edgerton* v. *Clinton*, 311 Conn. 217, 230 n.13, 86 A.3d 437 (2014). In the present case, only the identifiable victim-imminent harm exception to governmental immunity is at issue.[14] We have explained that this exception, which "has received very limited recognition in this state"; (internal quotation marks omitted) *Grady* v. *Somers*, 294 Conn. 324, 350, 984 A.2d 684 (2009); "has three requirements: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm. . . . All three must be proven in order for the exception to apply." (Citation omitted; internal quotation marks omitted.) *Edgerton* v. *Clinton*, supra, 230–31. We have stated that this court has "construed this exception to apply not only to identifiable individuals but also to narrowly defined identified classes of foreseeable victims." (Internal quotation marks omitted.) *Durrant* v. *Board of Education*, 284 Conn. 91, 100, 931 A.2d 859 (2007).

The trial court rested its conclusion that the exception did not apply on the second of the three requirements, determining that there was no evidence in the record that the decedent was either a member of a foreseeable class or an identifiable individual. In arguing that the decedent was an identifiable victim, the plaintiff challenges both of those determinations by the trial court. We first consider the plaintiff's claim that the decedent was a member of a foreseeable class—a claim that cannot be squared with our case law. We repeatedly have emphasized "the narrowness of the class of persons who may be identified as foreseeable victims . . . [observing that] [t]he only identifiable class of foreseeable victims that we have recognized for these purposes is that of schoolchildren attending public schools during school hours because: they were intended to be the beneficiaries of particular duties of care imposed by law on school officials; they were legally required to attend school rather than being there voluntarily; their parents were thus statutorily required to relinquish their custody to those officials during those hours; and, as a matter of policy, they traditionally require special consideration in the face of dangerous conditions." (Citation omitted; internal quotation marks omitted.) *Grady* v. *Somers*, supra, 294 Conn. 351–52. As the trial court correctly observed in its memorandum of decision, the record in the present case revealed that the decedent was not legally compelled to get into the Mustang and was a voluntary passenger in the vehicle. The trial court correctly concluded that the plaintiff failed to demonstrate that the decedent was a member

of a foreseeable class of identifiable victims.

The plaintiff's suggestion to the contrary—namely, that, because § 14-283 (d) requires officers to "drive with due regard for the safety of *all persons* and property"; (emphasis added); the decedent belonged to a foreseeable class of identifiable persons—would be inconsistent with both this court's prior interpretations of the scope of the identifiable person-imminent harm exception and the public policy principles underlying governmental immunity. As we have explained, "[o]ur decisions underscore . . . that whether the plaintiff was compelled to be at the location where the injury occurred remains a paramount consideration in determining whether the plaintiff was . . . [a] member of a foreseeable class of victims." (Internal quotation marks omitted.) *Strycharz* v. *Cady*, 323 Conn. 548, 575–76, 148 A.3d 1011 (2016). We have thus far found this condition to be satisfied only in the case of school-children attending a public school during school hours.

As a matter of public policy, moreover, the plaintiff's argument must be rejected. There is no question that the officers owed a duty to drive with due regard for the safety of all persons and property. The mere fact that the officers owed a duty to a group of persons that included the decedent, however, did not make the decedent a member of a foreseeable class of victims. As we explained in part I of this opinion, because the duty imposed by § 14-283 (d) requires the exercise of judgment and discretion, governmental immunity applies. Under the plaintiff's theory, however, every person who is injured as a result of a police pursuit is a member of a foreseeable class of identifiable victims. If we were to agree with the plaintiff, the identifiable victim-imminent harm exception would apply to *every police pursuit*, and the exception would swallow the rule. That conclusion would run contrary to the public policy principles underlying the grant of governmental immunity to the discretionary acts of municipal officers. As we explained in part I of this opinion, discretionary act immunity "reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury." (Internal quotation marks omitted.) *Violano* v. *Fernandes*, supra, 280 Conn. 319. If we were to accede to the plaintiff's argument, police officers would not have the discretion to determine whether, in their judgment, after considering the particular circumstances presented, a pursuit is warranted.

We next address the plaintiff's claim that the decedent was an identifiable individual. We previously have stated that "[a]n individual may be 'identifiable' for pur-

poses of the exception to qualified governmental immunity if the harm occurs within a limited temporal and geographical zone, involving a temporary condition. *Purzycki* v. *Fairfield*, [244 Conn. 101, 110, 708 A.2d 937 (1998), overruled in part on other grounds by *Haynes* v. *Middletown*, 314 Conn. 303, 323, 101 A.3d 249 (2014)]; see *Tryon* v. *North Branford*, 58 Conn. App. 702, 710, 755 A.2d 317 (2000) (because harm occurred within framework limited in duration, place and condition, plaintiff was 'identifiable person' within meaning of exception). For the harm to be deemed imminent, the potential for harm must be sufficiently immediate. In fact, the criteria of identifiable person and imminent harm must be evaluated with reference to each other. An allegedly identifiable person must be identifiable as a potential victim of a specific imminent harm. Likewise, the alleged imminent harm must be imminent in terms of its impact on a specific identifiable person." *Cotto* v. *Board of Education*, 294 Conn. 265, 275–76, 984 A.2d 58 (2009).

The plaintiff's argument that the decedent was an identifiable individual is unavailing. The plaintiff's argument rests on her theory that Renaldi could or should have seen the decedent in the Mustang. Specifically, the plaintiff claims that Renaldi should have been aware of the decedent's presence in the Mustang because Renaldi performed a U-turn after he noticed the undercarriage lights, which positioned him behind the Mustang after he made the turn. That maneuver required him to drive past the Mustang, which was a convertible with the top down, so he likely would have been able to see the passengers in the vehicle, particularly since the boys were wearing "brightly striped, pink zebra hats." The plaintiff also argues that, because driving around town in this manner was a Friday night tradition for the boys, Renaldi "would have recognized [them] immediately."

In making this argument, the plaintiff relies heavily on the sole decision in which this court has concluded that a plaintiff had demonstrated that the person who was harmed was an identifiable individual—*Sestito* v. *Groton*, supra, 178 Conn. 520. In *Sestito*, an on duty municipal police officer watched an ongoing barroom brawl involving at least seven men taking place in a bar's parking lot. Id., 522–23. Despite the officer's belief that "one member of the group might [have been] armed and a robbery suspect," and, despite his own admission that "he could have driven unimpeded into the lot," he did not intervene until after the decedent was shot and killed. Id., 523. As we have previously observed, however, "we decided *Sestito* before we adopted the three-pronged imminent harm test . . . ." *Edgerton* v. *Clinton*, supra, 311 Conn. 240. Moreover, this court has repeatedly stated that *Sestito* has been confined to its facts. See *St. Pierre* v. *Plainfield*, 326 Conn. 420, 436 n.15, 165 A.3d 148 (2017); *Edgerton* v. *Clinton*, supra,

240; *Grady* v. *Somers*, supra, 294 Conn. 353–54.

Even if we assume without deciding that the plaintiff's representation of the record is correct,[15] the plaintiff's argument that the decedent was an identifiable individual implicates the same public policy principle as her argument that he was a member of a foreseeable class of victims. That is, because in the context of a police pursuit, there will *always* be at least one person whose presence the police could or should be aware of—the driver of the pursued vehicle—if we agreed with the plaintiff, the exception would swallow the rule.

Accordingly, because the plaintiff failed to demonstrate that the decedent was an identifiable individual, and, because the decedent was not a member of a foreseeable class of identifiable victims, we conclude that the trial court correctly determined that the plaintiff had failed to prove that the identifiable person-imminent harm exception to discretionary act immunity applied.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and PALMER, McDONALD, D'AURIA, and MULLINS, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

** June 24, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] Although § 14-283 has been amended by the legislature since the events underlying the present case; see, e.g., Public Acts 2014, No. 14-221, § 1; these amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[3] Renaldi testified at his deposition that, because he was traveling in the opposite direction at the time that he observed the Mustang's underglow lights, he made a U-turn in order to position himself behind the Mustang. Major recalled the start of the pursuit differently, and testified at his deposition that Renaldi's car was positioned to the side of the road, "hiding" in between a Peak Fitness building and a gate. According to Major, the police cruiser pulled out behind the Mustang after they passed it, and the driver did not make a U-turn. We consider it immaterial whether Renaldi made a U-turn or pulled out from the side of the road.

[4] There was conflicting evidence as to whether Jasmin had joined the pursuit of the Mustang. In a statement provided to the police and attached as an exhibit to the plaintiff's objection to the defendants' motion for summary judgment, a witness stated that he saw two police cruisers pursuing the Mustang. Jasmin swore in an affidavit attached as an exhibit to the defendants' motion for summary judgment, however, that he was not engaged in the pursuit that evening and was not even aware at the time that a pursuit was taking place. The trial court acknowledged that factual dispute and observed that it was undisputed that Jasmin responded to the scene of the accident. Because the trial court concluded that there were no remaining issues of material fact as to governmental immunity, we infer that the court concluded that the factual dispute regarding Jasmin's participation in the pursuit was not material. We agree. Even if we assume without deciding that Jasmin was involved in the pursuit, that fact is immaterial to the question of whether the trial court correctly concluded that the doctrine of governmental immunity applied.

[5] We emphasize that the question presented is limited both by the record presented and by the arguments that the plaintiff has presented on appeal. Because the facts of this case involve a police officer's response to observed illegal conduct, this appeal does not concern routine conduct during day-to-day operations but, rather, an officer's response to a violation of the law.

Additionally, the plaintiff's argument on appeal narrows the issue presented. Specifically, in her brief, the plaintiff states: "[T]he question before this court is limited to determining whether the legislature intended to create a ministerial obligation [for] officers to first account for the seriousness of the offense and the dangerousness of the pursuit *before engaging in it* when the legislature passed § 14-283." (Emphasis added.) She states that this requirement, "that an officer, at the start of a pursuit, take account of the safety of others, and balance that against the seriousness of the offense," is one that is mandatory and not subject to the officer's discretion. If this court agrees with the plaintiff, she explains, "it falls to the jury to determine if the pursuing officers failed to take those factors into account at all *when they first engaged in an extremely dangerous, nighttime pursuit* [for] a minor infraction." (Emphasis added.) Accordingly, this appeal is confined to an officer's decision to initiate a pursuit and does not concern the much broader question of whether and under what circumstances the duty to drive with due regard for the safety of others is discretionary or ministerial. See *Bieluch* v. *Bieluch*, 199 Conn. 550, 555, 509 A.2d 8 (1986) (declining to address issue not raised in party's brief).

In light of the narrow question presented in this appeal, we disagree with the dissent's assessment of the scope and effect of today's decision. The dissent implicitly acknowledges the narrow reach of our decision when it provides an assessment of what it views as the likely odds that a plaintiff will "succeed in a negligence lawsuit brought against a municipality or municipal employee for that employee's negligence." Text accompanying footnote 4 of the dissenting opinion. In a footnote, the dissent qualifies that statement: "This assessment is not meant to include lawsuits seeking recovery for personal injury or property damage caused by the negligent operation of a motor vehicle under routine conditions." Footnote 4 of the dissenting opinion.

[6] Because the requirement "to drive with due regard for the safety of all persons and property" imposes a duty to exercise discretion, § 14-283 (d) falls squarely within the general rule of § 52-557n (a) (2) that municipalities "shall not be liable for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." Nothing in the language of § 14-283, which exclusively governs response to emergencies, supports the position that the legislature intended to impose anything other than a discretionary duty, or that it intended to delineate an exception to § 52-557n.

[7] General Statutes (Supp. 2020) § 14-283a (b) (1) provides: "The Commissioner of Emergency Services and Public Protection, in conjunction with the Chief State's Attorney, the Police Officer Standards and Training Council, the Connecticut Police Chiefs Association and the Connecticut Coalition of Police and Correctional Officers, shall adopt, in accordance with the provisions of chapter 54, a uniform, state-wide policy for handling pursuits by police officers. Such policy shall specify: (A) The conditions under which a police officer may engage in a pursuit and discontinue a pursuit, (B) alternative measures to be employed by any such police officer in order to apprehend any occupant of the fleeing motor vehicle or to impede the movement of such motor vehicle, (C) the coordination and responsibility, including control over the pursuit, of supervisory personnel and the police officer engaged in such pursuit, (D) in the case of a pursuit that may proceed and continue into another municipality, (i) the requirement to notify and the procedures to be used to notify the police department in such other municipality or, if there is no organized police department in such other municipality, the officers responsible for law enforcement in such other municipality, that there is a pursuit in progress, and (ii) the coordination and responsibility of supervisory personnel in each such municipality and the police officer engaged in such pursuit, (E) the type and amount of training in pursuits, that each police officer shall undergo, which may include training in vehicle simulators, if vehicle simulator training is determined to be necessary, and (F) that a police officer immediately notify supervisory personnel or the officer in charge after the police officer begins a pursuit. The chief of police or Commissioner of Emergency Services and Public Protection, as the case may be, shall inform each officer within such chief's or said commissioner's department and each officer responsible for law enforcement in a municipality in which there is no such department of the existence of the policy of pursuit to be employed by any such officer and shall take whatever measures that are necessary to assure that each such officer understands the pursuit policy established."

All references in this opinion to § 14-283a are to the version of that statute set forth in the 2020 Supplement to the General Statutes.

[8] The applicable Hartford Police Department policy and procedure similarly required officers to remain at the scene "for a reasonable time until, in the reasonable judgment of the officer, the likelihood of further imminent violence has been eliminated." *Coley* v. *Hartford*, supra, 312 Conn. 153 n.2.

[9] Section 14-283a-4 of the Regulations of Connecticut State Agencies provides in relevant part: "(a) Initiation of Pursuit.

"(1) The decision to initiate a pursuit shall be based on the pursuing police officer's conclusion that the immediate danger to the police officer and the public created by the pursuit is less than the immediate or potential danger to the public should the occupants of such vehicle remain at large.

"(2) In deciding whether to initiate a pursuit, the police officer shall take the following factors into consideration:

"(A) Road, weather and environmental conditions;

"(B) Population density and vehicular and pedestrian traffic;

"(C) Whether the identity of the occupants is known and immediate apprehension is not necessary to protect the public or police officers and apprehension at a later time is feasible;

"(D) The relative performance capabilities of the pursuit vehicle and the vehicle being pursued;

"(E) The seriousness of the offense; and

"(F) The presence of other persons in the police vehicle.

"(b) Pursuit Operations.

"(1) All authorized emergency vehicle operations shall be conducted in strict conformity with Sections 14-283a-1 to 14-283a-4, inclusive, of the Regulations of Connecticut State Agencies, and section 14-283a of the Connecticut General Statutes.

"(2) Upon engaging in or entering into a pursuit, the pursuing vehicle shall activate appropriate warning equipment. An audible warning device shall be used during all such pursuits.

"(3) Upon engaging in a pursuit, the police officer shall immediately notify communications of the location, direction and speed of the pursuit, the description of the pursued vehicle and the initial purpose of the stop. The police officers shall keep communications updated on the pursuit. Communications personnel shall immediately notify any available supervisor of the agency or agencies involved in such pursuit, clear the radio channel of non-emergency traffic, and relay necessary information to other police officers of the involved police agency or agencies, and adjacent police agencies in whose direction the pursuit is proceeding.

"(4) When engaged in a pursuit, police officers shall drive with due regard for the safety of persons and property.

"(5) Unless circumstances dictate otherwise, a pursuit shall consist of no more than three police vehicles, one of which shall be designated as the primary unit. No other personnel shall join the pursuit unless instructed to participate by a supervisor.

"(6) The primary unit involved in the pursuit shall become secondary when the fleeing vehicle comes under police air surveillance or when another unit has been assigned primary responsibility.

"(c) Supervisory Responsibilities.

"(1) When made aware of a pursuit, the appropriate supervisor shall evaluate the situation and conditions that caused the pursuit to be initiated, the need to continue the pursuit, and shall monitor incoming information, coordinate and direct activities as needed to ensure that proper procedures are used. Such supervisor shall also have the authority to terminate the pursuit. When the agency supervisor communicates a termination directive, all agency vehicles shall disengage warning devices and cease the pursuit.

"(2) Where possible, a supervisory police officer shall respond to the location where a vehicle has been stopped following a pursuit.

"(d) Pursuit Tactics.

"(1) Police officers not engaged in the pursuit as the primary or secondary unit shall not normally follow the pursuit on parallel streets unless authorized by a supervisor or when it is possible to conduct such an operation without unreasonable hazard to other vehicular or pedestrian traffic.

"(2) When feasible, available patrol units having the most prominent markings and emergency lights shall be used to pursue, particularly as the primary unit. When a pursuit is initiated by other than a marked patrol unit, such unit shall become the secondary unit when a marked unit becomes available as the primary unit, and such unit shall disengage from the pursuit when another marked unit becomes available as the secondary unit.

"(e) Termination of the Pursuit.

"(1) The police officer serving as the primary unit engaged in the pursuit shall continually re-evaluate and assess the pursuit situation, including all of the initiating factors, and terminate the pursuit whenever he or she reasonably believes that the risks associated with continued pursuit are greater than the public safety benefit of making an immediate apprehension.

"(2) The pursuit may be terminated by the primary unit at any time.

"(3) A supervisor may order the termination of a pursuit at any time and *shall* order the termination of a pursuit when the potential danger to the public outweighs the need for immediate apprehension. Such decision shall be based on information known to the supervisor at the time of the pursuit.

"(4) A pursuit may be terminated if the identity of the occupants has been determined, immediate apprehension is not necessary to protect the public or police officers, and apprehension at a later time is feasible.

"(5) A pursuit may be terminated when the police officers are prevented from communicating with their supervisors, communications or other police officers. . . ." (Emphasis in original.)

[10] We reiterate that this appeal is limited to whether the decision to engage in a pursuit of a fleeing motorist is a ministerial or discretionary act, and does not address the manner of driving or the conduct of the pursuit itself. See footnote 5 of this opinion. The distinction between the two—the decision whether to initiate a pursuit and the manner in which that pursuit is conducted—is illustrated in the Uniform Statewide Pursuit Policy, which treats the initiation of a pursuit under a separate subsection. See footnote 9 of this opinion. As we explain, that subsection details the various factors that officers must consider in determining whether to initiate a pursuit, including road, weather and environmental conditions. We discuss those factors in detail in the body text accompanying this footnote.

The *manner* of the pursuit is governed by subsections (b) and (d) of § 14-283a-4 of the Regulations of Connecticut State Agencies. Those subsections set forth, respectively, the rules governing pursuit operations and pursuit tactics. See footnote 9 of this opinion. A few examples illustrate the distinction further. The pursuing vehicle must "activate appropriate warning equipment" and use "[a]n audible warning device" during the pursuit. Regs., Conn. State Agencies § 14-283a-4 (b) (2). The pursuit must not consist of more than three vehicles. Id., § 14-283a-4 (b) (5). Pursuing officers "shall not normally follow the pursuit on parallel streets unless authorized by a supervisor or when it is possible to conduct such an operation without unreasonable hazard to other vehicular or pedestrian traffic." Id., § 14-283a-4 (d) (1). When feasible, vehicles with the most prominent markings should be used in the pursuit. Id., § 14-283a-4 (d) (2).

[11] We observe that, pursuant to General Statutes § 4-170 of the Uniform Administrative Procedure Act, the Uniform Statewide Pursuit Policy, as set forth in §§ 14-283a-1 through 14-283a-4 of the Regulations of Connecticut State Agencies, is subject to the review of the standing legislative regulation review committee, comprised of members of the General Assembly, which has the authority to reject proposed regulations. That approval process ensures that the regulations are consistent with legislative intent.

[12] To the extent that the dissent contends that our statutory interpretations of § 52-557n have strayed from the intent of the legislature when it codified the common law through § 52-557n in 1986, we disagree. If this court's interpretation of § 52-557n were contrary to the intent of the legislature, surely, at some point in the almost forty years that have passed since the passage of § 52-557n, the legislature would have weighed in on the issue. As we have explained, "[t]ime and again, we have characterized the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute. . . . Once an appropriate interval to permit legislative reconsideration has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision." (Internal quotation marks omitted.) *Spiotti* v. *Wolcott*, 326 Conn. 190, 202, 163 A.3d 46 (2017).

[13] The plaintiff argues that, because she has never claimed that the decedent was a member of a foreseeable class of identifiable victims, the defendants' arguments that he was not a member of a foreseeable class are irrelevant. Our review of the record, however, reveals that the plaintiff did make this argument before the trial court, which concluded that the decedent was not a member of a foreseeable class of identifiable victims. Moreover, as we explain in this opinion, by contending that the decedent was identifiable

because he was included in the statutory language of "all persons" in § 14-283 (d), the plaintiff implicitly argues that the decedent was a member of a foreseeable class of identifiable victims.

[14] The other two exceptions are: "where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws; and . . . where the alleged acts involve malice, wantonness or intent to injure, rather than negligence." (Internal quotation marks omitted.) *Grady* v. *Somers*, 294 Conn. 324, 338 n.14, 984 A.2d 684 (2009).

[15] In rejecting the plaintiff's claim that the decedent was an identifiable individual, the trial court addressed the argument that the plaintiff made in support of that proposition, namely, that the decedent was an identifiable individual because Renaldi should have recognized the Mustang from a previous incident in which he had pulled that vehicle over, and that Renaldi had the opportunity to observe that there were passengers in the vehicle on the night in question. The trial court determined that there was *no evidence* in the record that Renaldi knew that the decedent was a passenger in the Mustang.

Although we assume for purposes of argument that the plaintiff's representation of the record is correct, there are weaknesses in her argument. In claiming that there was evidence that Renaldi should have been aware that there were passengers in the vehicle, she points to the fact that the boys were in a Mustang convertible with its top down in the winter, that the boys wore brightly striped, pink zebra hats, and that Renaldi had stopped the Mustang on a prior occasion when the boys were in that same vehicle, wearing the hats. At his deposition, however, Renaldi testified that, when he initially noticed the Mustang, he did not even notice that it was a convertible and did not notice how many persons were inside the vehicle. Renaldi's attention initially was drawn to the undercarriage lights, which were like disco lights, shining to the back and to the front. He then focused on trying to obtain the license plate number, because it was his preferred practice to obtain the license plate number prior to stopping a vehicle. As for his prior contact with the Mustang, Renaldi testified at his deposition that he did not recall that prior contact until two weeks later, when another officer ran the license plate number and pointed out the prior contact to Renaldi. Only then did Renaldi recall that he had previously stopped the Mustang and that the boys had been driving the convertible with the top down in winter and were wearing "goofy hats." Moreover, the only evidence provided regarding the zebra hats on the night in question was that Major wore one and that Ramirez "might" have had one on. Not only was there no evidence that the decedent was wearing a zebra hat, but Major testified at his deposition that the decedent was asleep in the back seat of the Mustang.

———————————